**Isaac ROSE, et al., Plaintiffs**

v.

**VOLVO CONSTRUCTION EQUIP-
MENT NORTH AMERICA,
INC., Defendant.**

**Case No. 1:05 CV 168.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 17, 2008.

Joyce Goldstein, Cleveland, OH, for Plaintiffs.

Fred Seleman, Thomas H. Barnard, Jr., Cleveland, OH, for Defendant.

## ORDER

SOLOMON OLIVER, JR., District Judge.

On February 1, 2005, Plaintiffs Isaac Rose, Peggy Knox, Joseph Henderson, Wilbert Whitt, Opal Whitt, Andrew Bergant, Jr., A.C. Wade, and Metro Burtyk, on behalf of themselves and all others similarly situated, along with International Union, and the United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") (together, "Plaintiffs") filed the above-captioned action against Defendant Volvo Construction Equipment North America, Inc. ("Defendant" or "VCENA"). After Plaintiffs amended their Complaint by withdrawing all individual claims for monetary damages (*see* Third Amended Compl. ("TAC"), ECF

No. 138), the court certified the instant suit as a class action for declaratory and injunctive relief. (Order, ECF No. 175.) VCENA filed third-party claims against Euclid–Hitachi Heavy Equipment, Inc. ("EHHE"), Hitachi Construction Machinery ("HCM"), Hitachi Construction Manufacturing Ltd. ("HTM"), and Deere–Hitachi Construction Machinery Corp. ("Deere–Hitachi") for declaratory judgment and damages. Upon separate motions from each of the Defendants, the court stayed the third-party claims pending arbitration. (ECF No. 174.)

Plaintiffs comprise a class of hourly-paid retirees and spouses, surviving spouses, and dependents of retirees. Plaintiffs allege that VCENA violated Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. Specifically, Plaintiffs allege that VCENA breached the parties' Collective Bargaining Agreement ("CBA") to provide lifetime, fully-funded health care insurance benefits to the retirees, spouses, surviving spouses, and eligible dependents of retirees as well as lifetime, fully-funded life insurance benefits to retirees. Plaintiffs seek declaratory judgment and injunctive relief.

Now pending before the court are Plaintiffs' Motion for Summary Judgment (ECF No. 155), Defendant's Motion for Summary Judgment (ECF No. 156); Plaintiffs' Motion for Preliminary Injunction (ECF No. 182), and Defendant's Motion for Order Striking Plaintiffs' Affidavits or, in the Alternative, for Leave to Depose Affiants and Leave to File Surreply ("Motion to Strike") (ECF No. 195). For the reasons set forth below, Plaintiffs' Motion for Summary Judgment (ECF No. 155) is granted, Defendant's Motion for Summary Judgment (ECF No. 156) is denied, Plaintiffs' Motion for Preliminary Injunction (ECF No. 182) is denied as moot, and Defendant's Motion to Strike (ECF No. 195) is denied as moot.

## I. FACTS AND PROCEDURAL HISTORY

The court has already set out the general factual background of the within case in a previous Order dated March 21, 2007, 2007 WL 893049. That Order states, in relevant part:

Plaintiffs maintain that VCENA and/or various other corporate entities operated facilities in Euclid, Ohio, involved with heavy truck manufacturing, engineering, and testing (the "Euclid Facility"). The individual Plaintiffs allege they are retirees, retiree spouses, surviving spouses or dependants of retirees from the Euclid Facility, who retired prior to January 1, 1987. While the Plaintiff retirees were employed at the Euclid Facility, the UAW and UAW Local 70, or its predecessor UAW Local 426 (collectively, the "Union"), served as their exclusive bargaining representative.

In 1984, Defendant VCENA, operating under the name of Clark Michigan Company ("Clark"), purchased the assets of the Euclid Facility, involved with heavy truck manufacturing, engineering, and testing. In 1994, Defendant VCENA, then operating under the name of "VME Americas Inc." ("VME"), entered into a joint venture agreement with Hitachi Construction Machinery ("HCM") to create Euclid–Hitachi Heavy Equipment, Inc. ("EHHE") and EHHE's wholly-owned Canadian subsidiary, Hitachi Construction Manufacturing Ltd. ("HTM"). EHHE was to operate the Euclid Facility. Between 1994 and 2000, VCENA transferred its interest in EHHE to HCM, until EHHE became a wholly-owned subsidiary of HCM in 2000. Sometime after 2001, the Euclid

Facility was controlled by HTM, which operated the facility through one of its branches or divisions called the Euclid–Hitachi Technical Center ("EHTC").

While operating under the name of Clark, Plaintiffs allege that VCENA was bound by a collective bargaining agreement with the Union, effective [from] 1983 to 1986 (the "1983 CBA"). (*See* Third Amended Complaint ("TAC"), [ ] ECF No. 138.) The 1983 CBA allegedly contained a section entitled, "Pension Plan, Insurance Program and Supplemental Unemployment Benefit Plan," which stated that the terms of the healthcare and life insurance benefits were contained in a series of Supplemental Agreements. [*See* 1983 CBA at 144, ECF No. 144.] [According to Plaintiffs,] [t]he Supplemental Agreements provided for an insurance program that guaranteed retirees and their spouses, surviving spouses, and eligible dependents fully paid healthcare benefits for life. [*See* Supplemental Agreements, at 22–24–B, 96–B, and 97–98–B, ECF No. 145. Plaintiffs also contend that the insurance program set forth in the Supplemental Agreements also guaranteed retirees fully paid life insurance benefits for life. (*See id.* at Art II, 28–84–B.) ] Plaintiffs maintain that all subsequent collective bargaining agreements with HTM and its predecessors, including VCENA operating as Clark and VME, guaranteed retirees, their spouses and dependents the same coverage that they received under the 1983 CBA.

In a letter dated January 12, 2005, all retirees and their spouses, surviving spouses, and dependents were informed that their benefits would be cancelled as of February 28, 2005. (*See* TAC, Ex. 9 (January 12, 2005 Form Letter).) The letter stated that EHHE was going out of business and the current retiree life and healthcare benefits would terminate on February 28, 2005. (*Id.*) Plaintiffs allege that VCENA was obligated to provide them with "vested lifetime retiree health care and life insurance benefits" and that VCENA has breached this obligation. (*See* TAC ¶¶ 64–66.)

(Order, ECF No. 175, at 2–4.)

On February 9, 2005, the UAW and EHHE and HCM executed a Retiree Benefit Agreement ("RBA"), under which EHHE, VCENA's successor, and HCM agreed to continue funding the same health care and life insurance benefits to hourly-paid retirees and their dependents through March 31,2005, and thereafter to contribute funds through an independent Voluntary Employees' Beneficiary Association ("VEBA"), which was established under Section 501(c)(9) of the Internal Revenue Code. (TAC ¶¶ 42–45.) According to Plaintiffs, the VEBA trust was intended to settle Plaintiffs' claims against the participating entities and to provide temporary benefits to Plaintiffs pending resolution of the instant lawsuit, which seeks lifetime benefits, with VCENA. According to Defendant, Plaintiffs released VCENA from liability through Plaintiffs' settlement agreement with EHHE. On August 24, 2006, both parties moved for summary judgment, arguing that the parties' intention to vest (in Plaintiffs' view) or not vest (in Defendant's view) lifetime, fully-funded benefits is clear from the unambiguous language of the CBA or, alternatively, through extrinsic evidence.

On August 3, 2007, Plaintiffs filed a Motion for Preliminary Injunction (ECF No. 182), seeking temporary relief against VCENA, on the ground that the trustees to the VEBA trust had reduced Plaintiffs' insurance benefits in order to extend the life of the trust due to VCENA's failure to pay lifetime benefits. Defendant then filed a Motion to Strike (ECF No. 195) the affidavits that Plaintiffs submitted with

their Reply in Support of Motion for Preliminary Injunction.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir.1999).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id.*

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e).

## III. LAW AND ANALYSIS

Because a finding that Plaintiffs' have released VCENA from liability would preclude Plaintiffs from pursuing their claims against VCENA for insurance benefits, the court will address this issue first.

### A. Whether Plaintiffs' Settlement with EHHE Discharged VCENA

■ Defendant argues that Plaintiffs' settlement with EHHE through the RBA effectively discharged VCENA because: (1) the settlement did not expressly preserve VCENA's recourse against EHHE; and (2) the settlement increased VCENA's

risk of loss and decreased VCENA's ability to shift the cost of liability to EHHE. In response, Plaintiffs argue that: (1) ERISA and federal labor law preempt Defendant's state surety law arguments herein; and (2) the settlement agreement fulfills all requirements for Plaintiffs to retain their claims against VCENA. As discussed below, the court finds that the settlement did not discharge VCENA.

The court will accept several of Defendant's assertions without discussion, despite Plaintiffs' arguments to the contrary, because the court finds that they are not dispositive. Accordingly, the court will assume that state surety law is not preempted by ERISA and therefore applies to the instant case. The court will also assume that EHHE is the primary obligor of the disputed retiree benefits, and that VCENA constitutes EHHE's surety, or secondary obligor. Even so, the court finds Defendant's argument that Plaintiffs' settlement with EHHE released VCENA is not well-taken.

Defendant argues that under *Gholson v. Savin,* 137 Ohio St. 551, 560, 31 N.E.2d 858 (Ohio 1941), the terms of a settlement agreement must "reserve not only the creditor's right against the surety, but the surety's right against the principal as well." Defendant also quotes Section 39 of the Third Restatement of Suretyship & Guaranty ("Restatement") for this proposition. The Restatement provides, in pertinent part:

> To the extent that the obligee releases the principal obligor from its duties pursuant to the underlying obligation:
>
> . . . .
>
> (b) the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation unless:
>
> > (i) the terms of the release effect a preservation of the secondary obligor's recourse . . .; or

> (ii) the language or circumstances of the release otherwise show the obligee's intent to retain its claim against the secondary obligor . . . .

*Id.* Upon examining the instant RBA and the New Participation Agreement ("NPA"), in which the individual workers joined the settlement agreement, the court finds that these documents satisfy the requirements of both *Gholson* and the Restatement that the settlement agreement must indicate that the secondary obligor's recourse against the principal obligor is preserved.

The RBA settlement was signed on February 9, 2005. It reads, in relevant part:

> 11. **Union's Covenant Not to Sue:** The Union and UAW Local 70 agree that neither they nor their officers or employees will bring any grievance, arbitration, lawsuit, or other claim (or materially assist anyone else to do so, except as required by law) against EHHE or its parent HCM, either's affiliates, any of their officers, employees, agents or benefit plans, or any of their predecessors, with respect to the reduction or elimination of retiree health or welfare benefits other than to enforce this Agreement. They further agree to use their best efforts to discourage any of their affiliates from doing any of the foregoing. The preceding sentences shall not bar the Union, any of its locals, or any of their officers or employees from bringing any grievance, arbitration, lawsuit, or other claim against Volvo or any of its predecessors, or their officers or employees.

(RBA ¶ 11, ECF No. 156–7, at 3.) In addition, the Appendix to the RBA includes an example of an NPA, which the parties do not dispute that each Plaintiff signed. The NPA provides, in pertinent part:

> In exchange for the benefits Euclid–Hitachi Heavy Equipment, Inc. (Euclid)

has offered to provide me, as set forth in paragraph (b), I agree as follows:

(a) **Background:** . . . . Except to the extent Euclid is legally obligated to continue to [sic] such benefits, I acknowledge that no Released Party has to provide them. The Released Parties are Euclid, Hitachi Construction Machinery Co., Ltd. (HCM), Hitachi Construction Truck Manufacturing Ltd[.] (HTM), and their affiliates, and their predecessors (*other than any Volvo company or affiliate, including [VCENA], and their predecessors and affiliates* ) and each such entity's current and former shareholders, directors, officers, employees, insurers, benefit programs, and all other related parties . . . . .

. . . .

(c) **Waiver of Claim to Prior Coverages:** In exchange for the substitute benefits described in paragraph (b), on behalf of myself and all members of my family and all of our successors, assignees, heirs, and legatees, I waive any known or unknown claims of any type I or they might have to any other life, health, or similar benefits, or anything in lieu of them, against every Released Party. I promise never to assert any such claim. I assign to HCM anything my family or I would otherwise receive as a result of anyone pursuing such a claim on my or their behalf. *The preceding sentence shall not apply to amounts any Released Party must pay to or for any Volvo company pursuant to an indemnification or similar agreement* . . . . .

(NPA, RBA Appendix, ECF No. 165–7, at 6) (emphasis added.)

While the language could have been written more clearly, the NPA refers to "amounts any Released Party must pay to or for any Volvo company pursuant to an indemnification or similar agreement." (NPA at (c).) This statement indicates that EHHE and all Plaintiffs acknowl-

edged Volvo, or VCENA's, right to seek indemnification against "any Released Party."

Furthermore, the "circumstances of the release" also demonstrate that Plaintiffs intended to pursue claims against VCENA, thus satisfying Section 39(b)(2) of the Restatement. In a letter dated December 17, 2004 (nearly two months before the RBA was executed), VCENA informed EHHE and HCM that it was aware of their negotiations with Plaintiffs and that

if the Hitachi entities [EHHE and HCM] do not intend to satisfy [their obligations to VCENA] in full, please consider this to be notice under the indemnity provisions of the various agreements between Volvo entities and Hitachi entities that Volvo intends to pursue its rights to indemnity under these agreements to the fullest extent possible.

(ECF No. 160–6.) In addition, Plaintiffs filed the instant suit against VCENA eight days prior to the execution of the RBA. Therefore, at the time the RBA was signed, all parties knew that Plaintiffs were pursuing claims against VCENA and that VCENA had stated its intention to seek indemnification from EHHE and HCM.

The court similarly rejects Defendant's argument that the settlement "increased VCENA's risk of loss, as well as jeopardized VCENA's ability to effectively subrogate against EHHE and/or HCM and shift the loss to them." (Def.'s Mot. Summ. J. at 18); *see* Restatement § 37. Defendant contends that:

[P]laintiffs, EHHE, and HCM each intended the RBA to serve as a vehicle to shift all remaining retiree health expenses from EHHE and HCM to VCENA, and to facilitate the flight of EHHE and HCM from the reach of U.S. courts, thus making it far more difficult (if not

impossible) for VCENA to invoke its contractual and common law indemnification and subrogation rights against EHHE and HCM, and forcing VCENA as surety to bear the entire loss.

(Def.'s Mot. Summ. J. at 18–19.) However, both EHHE and HCM remain third-party Defendants in the within case and, as Plaintiffs state, neither EHHE nor HCM have withdrawn their argument that this court lacks jurisdiction over them. (*See* ECF No. 108.) Consequently, the court finds that VCENA retains the ability to seek indemnification from EHHE and HCM. Therefore, the settlement did not release VCENA. As a result, Plaintiffs retain the right to pursue their claims against VCENA.

The court next examines whether the parties intended to vest lifetime, fully-funded life insurance and health care benefits for Plaintiffs.

## B. Analytical Framework and "the *Yard–Man* Inference"

The Sixth Circuit laid out the general principles controlling retiree benefit plans in *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir.2006).

A retiree health care insurance benefit plan is a welfare benefit plan under ERISA. *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir.2000) (citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir.1993)). Unlike pension plans, "there is no statutory right to lifetime health benefits." *Golden*, 73 F.3d at 653. If lifetime health care benefits exist for the plaintiffs, it is because the UAW and the defendants agreed to vest a welfare benefit plan. *Id.* at 654; *see also Boyer*, 986 F.2d at 1005. If a welfare benefit has not vested, "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Bittinger v. Tecumseh Prod. Co.*,

83 F.Supp.2d 851, 857 (E.D.Mich.1998) (quoting *Am. Fed'n of Grain Millers v. Int'l Multifoods*, 116 F.3d 976, 979 (2d Cir.1997)). If a welfare benefit has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation. *Maurer*, 212 F.3d at 914.

(footnote omitted).

In the seminal case of *UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983), the Sixth Circuit established the analytical framework for determining whether parties intended benefits to "continue beyond the expiration of the collective bargaining agreement." First, the court noted that, "[a]ny such surviving benefit must necessarily find its genesis in the collective bargaining agreement. . . . [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Id.* The court then noted the importance of context, stating:

The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.

*Id.* at 1479–80 (citations omitted). Where the CBA's language is ambiguous, *Yard–Man* held that "the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful

in clarifying a provision whose intended duration is ambiguous." *Id.* at 1480 (citations omitted). Finally, the court stated that its interpretation of a CBA should not "denigrate or contradict basic principles of federal labor law." *Id.* (citations omitted).

Following the framework set forth in *Yard–Man,* and consistent with general principles of contract interpretation, the court will first look to the language of the CBA itself. Only if the court finds that language to be ambiguous will the court then look to extrinsic evidence to determine the parties' intent.

The parties dispute the significance of certain language in the *Yard–Man* opinion that has become known as "the *Yard–Man* inference." The language, as well as its surrounding context, reads as follows:

> [R]etiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, *when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.* This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy identified to this Court presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent. Standing alone, this factor would be insufficient to find an intent to create interminable benefits. In the present case, however, this contextual factor buttresses the already sufficient evidence of such intent in the language of this agreement itself.

716 F.2d at 1482 (citations omitted and emphasis added). The *Yolton* court clarified the scope of the often-debated *Yard–Man* inference in the following statement:

> Under *Yard–Man* we may infer an intent to vest from the context and already sufficient evidence of such intent. Absent such other evidence, we do not start our analysis presuming anything.... [U]nder *Yard–Man,* "there is no legal presumption that benefits vest and that the burden of proof rests on plaintiffs." *Maurer,* [212 F.3d 907, 917 (6th Cir.2000) ]. This Court has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent. Rather, the inference functions more to provide a contextual understanding about the nature of labor-management negotiations over retirement benefits. That is, because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are "typically understood as a form of delayed compensation or reward for past services" it is unlikely that they would be "left to the contingencies of future negotiations." *Yard–Man,* 716 F.2d at 1481–82 (citations omitted). When other contextual factors so indicate, *Yard–Man* simply provides another inference of intent. All that *Yard–Man* and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation.

*Id.* at 579–580 (6th Cir.2006). Thus, the court will follow the analytical framework outlined in *Yard–Man,* as clarified by *Yolton.*

## C. Language of the CBA

The CBA in the instant case stated that it became effective on March 15, 1983, and would "continue in full force and effect without change until ... March 14, 1986."

(1983 CBA ¶ 180, at 143.) The CBA contained a section titled, "Pension Plan, Insurance Program and Supplemental Unemployment Benefit Plan," which stated as follows:

> The parties have provided for a Pension Plan, an Insurance Program and Supplemental Unemployment Benefit Plan by Supplemental Agreements signed by the parties simultaneously with the execution of this Agreement, which Supplemental Agreements are attached hereto as Exhibit "A", Exhibit "B" and Exhibit "C" respectively and made parts of this Agreement as if set out in full herein, subject to all provisions of this Agreement.

(*Id.* ¶ 181, at 144.)

Plaintiffs argue that the CBA unambiguously provided for lifetime, fully-funded benefits because a provision stated that health care coverage "shall be continued thereafter"; some health care benefits were tied to pension eligibility; the CBA did not reserve the right to unilaterally terminate life insurance benefits; extrinsic evidence in the Summary Plan Description ("SPD") demonstrates an intent to vest lifetime benefits; and the duration clause that appears in the Supplemental Agreement is "general" and thus does not terminate benefits on the date the CBA terminated. In response, Defendant argues that the CBA unambiguously did *not* provide lifetime, fully-funded benefits because the continuation of health care benefits is subject to a satisfaction clause; not all health benefits are tied to pension eligibility; the CBA reserved the employer's right to unilaterally modify or discontinue life insurance benefits; the SPD is not valid; and the duration clause specifically terminates benefits when the CBA terminates.

The court will analyze health care and life insurance benefits separately.

## D. Health Care Benefits for Retirees, Spouses, Surviving Spouses, and Eligible Dependents

### 1. The Effect of the Phrase "Shall Be Continued Thereafter Provided That"

■ The Section of the Insurance Program Agreement titled, "Continuance of Health Care (Other than Vision) Coverages Upon Retirement or Termination of Employment at Age 65 or Older" reads, in relevant part:

> Health Care Coverages[ ] an employee has under this Article at the time of retirement or termination of employment at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle him to a benefit under Article II of The Euclid, Inc., Hourly Rate Employees Pension *Plan shall be continued thereafter provided that* suitable arrangements for such continuation can be made with the local plans, or insured plan. Contributions for coverages *so continued* shall be in accordance with Article I, Section 3(b)(7).[1]

(Art. III, Section 5(a), Insurance Program Agreement, at 96–B) (emphasis added.) Plaintiffs argue that the language states that coverage "shall be continued" after an employee retires or is terminated, which indicates that health care benefits were intended to continue after the CBA terminated.

Defendant argues that the phrase "provided that" constitutes a condition, or satisfaction clause, which limits the continuation of benefits because it allows the

---

1. Article I, Section 3(b)(7) in turn provides that "[t]he Company shall contribute ... [health care] coverages continued in accordance with Art. III, Section 5" for pension-eligible retirees as well as employees who were terminated at age 65 but were not eligible for the pension plan.

employer to cease paying the coverage if suitable arrangements cannot be made,[2] thereby demonstrating that health care benefits were not meant to be vested for life. Plaintiffs contend that "provided that" is not a condition, but is instead an "impossibility of performance" clause that simply means that Defendant "would only be released from its obligation if companies stopped selling health insurance in Ohio [thus meaning that suitable arrangements could not be made with a local or insured plan], a fact not even alleged." (Pls.' Reply Br. at 7.)

Without ruling on whether "provides that" constitutes an impossibility clause, the court agrees with Plaintiffs that the "shall be continued thereafter" phrase indicates an intent to vest lifetime health care benefits. In *Cole v. ArvinMeritor*, No. 03–73872, 2006 WL 2385050, 2006 U.S. Dist. LEXIS 61003 (E.D.Mich. Aug. 17, 2006), the court examined a similar clause and found that the benefits were intended to vest for life. The court stated:

> Section 5(a) addresses, among other things, "continuance" of health care coverages for pension-eligible retirees. It provides, in pertinent part:
>
>> The Health Care ... Coverages an employee has under this Article at the time of retirement ... shall be continued thereafter provided that suitable arrangements for continuation can be made with the Carrier(s). Contributions for coverages so continued shall be in accordance with Article I, Section 3(b)(6).

(Ex. 114, Exhibit "B–1" at 72)

This language, tying pension status to retiree health benefits—and providing that the health benefits "at the time of retirement ... shall be continued thereafter" for retirees and "any eligible dependents"—constitutes an enforceable contractual promise of lifetime retiree health benefits to accompany lifetime pension benefits.

Thus, the *ArvinMeritor* court implicitly discredited the "provided that" phrase and relied on the "shall be continued thereafter" phrase in its finding of vested lifetime benefits. Similarly, in *Hinckley v. Kelsey–Hayes*, 866 F.Supp. 1034, 1040 (E.D.Mich. 1994), the district court granted a preliminary injunction for plaintiffs, based in part on its finding that:

> plaintiffs have cited specific provisions that indicate that retiree health benefits will be continued throughout their retirement years, beyond the expiration of any particular collective bargaining agreement. For example, section 5 of Article III of the 1991 agreement states that once an employee has retired or terminated employment at age sixty-five, his health benefits "shall be continued thereafter." Surviving spouses are assured that they will receive health benefits "as long as monthly survivor income benefits" are payable.

866 F.Supp. at 1042. The *Hinckley* court found vested lifetime benefits even where, as here, the language of the agreement stated that "[t]he health care coverages an

---

**2.** In its Reply Brief, Defendant contends that "it is undisputed that, at present, 'suitable arrangements' cannot in fact be made for the health care plan's continuation, because. the plan presently cannot obtain stop loss insurance coverage. (Trent Dep. 96.)" (Def.'s Reply Br. 8, ECF No. 164.) The evidence that Defendant cites is a deposition from Michelle Trent ("Trent"), who is a human resources employee for EHHE, HCM, and HTM. She states simply that no stop-loss insurance is provided. (Trent Dep. 96, ECF No. 168.) The court finds that Defendant did not raise the impossibility of performance as a defense. (VCENA Answer to TAC, ECF No. 151.) In any event, this evidence is insufficient to create a genuine issue of material fact regarding whether Defendant was unable to find suitable arrangements.

employee has under this Article at the time of retirement or termination of employment at age 65 or older ... *shall be continued thereafter provided that* suitable arrangements for such continuation[ ] can be made with the carrier(s)." *Id.* at 1039 (emphasis added).

For these reasons, the court finds that the "provided for" phrase does not express an unambiguous intent not to vest benefits. Instead, consistent with *ArvinMeritor* and *Hinckley,* the court finds that the "shall be continued thereafter" language indicates an unambiguous intent for Plaintiffs' health care benefits to continue after the CBA terminated.

### 2. Whether Health Care Benefits Are Linked to Pension Eligibility

Plaintiffs argue that the CBA links retirees' health care benefits to pension eligibility and that, because pension benefits are for life, this link evidences an intent to vest health care benefits for life. This proposition was explained in *Golden v. Kelsey–Hayes Co.,* 845 F.Supp. 410, 415 (E.D.Mich.1994), where the court granted a preliminary injunction for the plaintiffs, finding that "[t]here are no express provisions of the collective bargaining agreements that limit the duration of retiree health benefits. In fact, each of the collective bargaining agreements provides that eligibility for retiree health benefits is tied to eligibility for lifetime pension benefits or survivor spouse income." The Sixth Circuit affirmed, holding that "[s]ince retirees are eligible to receive pension benefits for life, the court found that the parties intended that the company provide lifetime health benefits as well." *Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 656 (6th Cir.1996). The district court later relied on this evidence in granting summary judgment for the plaintiffs. *Golden v. Kelsey–Hayes Co.,* 954 F.Supp. 1173, 1187 (E.D.Mich.1997). In addition, other district courts within the Sixth Circuit have held similarly, and the Sixth Circuit has upheld the granting of preliminary injunctions by district courts on this basis. *E.g., Yolton,* 435 F.3d at 580; *McCoy v. Meridian Auto. Sys.,* 390 F.3d 417, 422 (6th Cir. 2004); *ArvinMeritor,* 516 F.Supp.2d 850, 865–67 (E.D.Mich.2005); *Hinckley,* 866 F.Supp. at 1042. Furthermore, just as in those cases, the CBA in the instant case does not include any express provisions "that limit the duration of retiree health benefits or that allow [the employer] to modify or terminate those benefits at will." *Hinckley,* 866 at 1042; *accord Golden,* 845 F.Supp. at 413–14, 415.

Defendant points out that other sections provide health care benefits to retirees who are *not* eligible for pension. Consequently, Defendant argues, no link with pension benefits exists to suggest an intent to vest lifetime health care benefits for retirees.

The relevant sections read, in pertinent part:

Article I   Establishment, Financing and Administration of Insurance Program

. . . .

Section 3.   Company Contributions and Administration

. . . .

(b) Company Contributions for Health Care Coverages

. . . .

(7) For Retired and Certain Former Employees

The Company shall contribute the full premium or subscription charge for Health Care (including vision effective April 1, 1981) coverages continued in accordance with Article III, Section 5, for:

(i) a retired employee (including any eligible dependents), provided such retired employee is eligible for benefits under

Article II of the Euclid, Inc., Hourly–Rate Employees Pension Plan and

(ii) an employee (including any eligible dependents) termination at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle him to a benefit under Article II of The Euclid, Inc., Hourly–Rate Employees Pension Plan.[3]

As the quoted language indicates, Article I, Section 3(b)(7)(i) links health care benefits to pension benefits, while Article I, Section 3(b)(7)(ii) does not. However, despite Defendant's argument otherwise, this inconsistency is not fatal to Plaintiffs' argument Instead, it creates an ambiguity that allows the court to look at extrinsic evidence, in particular the SPD, to determine the parties* intent This approach was taken by the Sixth Circuit in *Golden*, which found that "[a] provision of one of the SPDs provides that those employees who retire *without* pension eligibility because they have not been with the company long enough to participate in the pension plan will, nonetheless, have *lifetime* health coverage at no cost." 73 F.3d at 656. The *Golden* court agreed with the plaintiffs' argument that "this specific language was necessary because these retirees do not have lifetime pension benefits to which to tie eligibility for health coverage, as do all the other retirees." *Id.*

The instant SPD states, in relevant part:

**General Information About Employee Benefits**

**EUCLID PAYS THE FULL COST**

. . .

. . . .

When you are retired, your life and extra accident insurance and all of your Health Care coverages are continued without cost to you.

. . . .

If you terminate employment with Euclid at age 65 or older for any reason other than discharge for cause, all of your Health Care coverages will be continued for the rest of your life without cost to you.

Euclid also pays the full cost of Health Care coverages for surviving spouses and eligible children of deceased pensioners and of employees who die after they are eligible to retire voluntarily under the Euclid Pension Plan.

(Euclid, Inc. Hourly–Rate Employees Benefit Plans, April 1, 1983 ("SPD") 26, ECF No. 161–3.) The language in the instant SPD is virtually identical to the language of the SPD in *Golden*, in which the district court granted summary judgment for the plaintiffs. *Golden*, 954 F.Supp. at 1176–77.

Moreover, the Sixth Circuit has held that "the language of SPDs is binding, and where there is a conflict between the language of the SPD and the other official plan documents, it is the SPD which is controlling." *Helwig v. Kelsey–Hayes Co.*, 93 F.3d 243, 250 (6th Cir.1996) (citing *Edwards v. State Farm Mut. Auto., Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988)).

Finally, the court rejects Defendant's argument that the SPD document is not valid because it does not contain all the categories of information required under 29 U.S.C. § 1022(b) and 29 C.F.R. § 2520.102–3. The court finds that the SPD includes all required information, including a description of the claims and appeal procedure, a statement of how the plan is administered, and a statement of how the collective bargaining agreement is maintained and that it is available for par-

---

**3.** Likewise, some of the provisions regarding health care benefits for surviving spouses are linked to the pension eligibility of the employee. (*See* Art I., § 3(8)(i); Art. III, § 6(b)(1)- (2), (4), at 23–B, 97–B–98–B.) Others are not (*See* Art. I, § 3(b)(ii); Art III, § 6(b)(3), at 23–B, 98–B.)

ticipants to examine upon request. (*See* SPD at 17–18, 26–30.)

### 3. Duration Clause

The parties disagree about the effect of a duration clause contained in the Supplemental Agreement Exhibit B to the CBA ("Insurance Program Agreement"), which applies to both the health care and life insurance benefits. Defendant argues that the CBA was unambiguously intended not to vest lifetime health care and life insurance benefits because the duration clause in the Insurance Program Agreement explicitly limits the duration of the insurance benefits to the time period that the CBA is in effect (*i.e.,* from 1983 to 1986). Plaintiffs argue that the provision is merely a "routine" or "general" duration clause, and is therefore not dispositive as to the duration of benefits. *See Yolton,* 435 F.3d at 580; *Yard–Man,* 716 F.2d at 1482–83.

The disputed duration clause in the Insurance Program Agreement reads as follows:

**Section 10. Duration of Agreement**

This Agreement and Program as modified and supplemented by this Agreement shall continue in effect until the termination of the Collective Bargaining Agreement of which this is a part.

(Supplemental Agreements at 14–B.) The Agreement defines "Program" as the "amended insurance program" attached to the Supplemental Agreement, which provides both health care and life insurance benefits. (*See id.* at 1–B.) The "Agreement" refers to the Insurance Program Agreement. (*See id.*) Defendant argues that a reading of the duration clause indicates that the Insurance Program Agreement is a part of the CBA and terminates on the date that the CBA terminates, and therefore the health care and life insurance benefits provided by the Insurance Program Agreement also terminate at that time.

### a. Lack of Specific Reference to Benefits or Coverage

Defendant relies upon *UAW v. Cleveland Gear Corp.,* No. C83–947, 1983 WL 2174, 1983 U.S. Dist. LEXIS 20400 (N.D.Ohio Oct. 20, 1983). However, the court finds that case to be distinguishable from the circumstances involved herein. In *Cleveland Gear,* the court found that the Master Contract and the Insurance Agreement expressly limited the duration of the insurance benefits to the duration of the CBA. The duration clause in the Master Contract is similar to the duration clause in the instant case. However, the duration clause in the Insurance Agreement expressly stated that "[t]his Group Insurance Plan, *and all group insurance coverage provided hereunder,* shall be effective ... until discontinued or superceded either in whole or in part by the termination or suspension of such Collective Bargaining Agreement...." *Id.* at *3, 1983 U.S. Dist. LEXIS 20400 at *8. The duration clause in the instant case, on the other hand, does not reference either the insurance benefits or coverage. Consequently, it is not clear that the instant duration clause was intended to terminate insurance benefits upon the termination of the CBA.

On the other hand, the court finds that Plaintiffs' reliance on *Hinckley* is well-taken. The court in *Hinckley* held that a duration clause identical to the one in the instant case was merely a "routine" durational clause. *Id.* The *Hinckley* court stated that the duration clauses that the defendant cited were "provisions that merely incorporate supplemental agreements concerning pension plans, unemployment benefit plans, and health care insurance programs into the collective bargaining agreement itself." *Id.* at 1041. Significantly, the court continued,

*[b]ecause such incorporated supplemental agreements would terminate on the date when the collective bargaining agreement terminated says nothing about the duration of particular benefits, especially benefits for retirees.* Defendant does not cite to any provision that specifically limits the duration of any particular benefit This was also the key element that was missing from the durational clause addressed by the Sixth Circuit in *Yard–Man. Yard–Man,* 716 F.2d at 1482.

*Id.* (footnote omitted and emphasis added). Likewise, the duration clause in the instant case does not specifically limit the duration of any particular benefit. Therefore, consistent with *Hinckley,* the court finds that the duration clause in the Insurance Plan Agreement is merely routine and general.

### b. The Effect of the Duration Clause in the Pension Plan Agreement

Furthermore, Plaintiffs point out that the Supplemental Agreement Exhibit A to the CBA ("Pension Plan Agreement") contains a duration clause nearly identical to the one in the Insurance Plan Agreement:

**Section 9. Duration of Agreement**

This agreement and Plan shall continue in effect until the termination of the collective bargaining agreement of which this is a part.

(Pension Plan Agreement at 15–A.) In this clause, "agreement" refers to the Pension Plan Agreement, and "Plan" refers to the "amended pension plan" that is attached to the Supplemental Agreement. (*See id.* at 1–A.) Thus, following Defendant's logic as to the Insurance Plan Agreement, the pension plan, too, would terminate on the date that the CBA terminates, even though pension benefits "are understood to be life." *Cole v. ArvinMeritor, Inc.,* 516 F.Supp.2d 850, 868 (E.D.Mich.2005). In response, Defendant acknowledges that the duration clause *should not* terminate the pension benefit. Defendant argues,

however, that it *should* terminate the insurance benefit. In essence, Defendant contends that the same language should have one meaning as to one benefit and an opposite meaning as to another benefit. Courts have rejected this argument, and have instead held that the same language used with regard to pension and life insurance benefits should be given the same effect as to each benefit. When faced with this issue, the Sixth Circuit stated:

The plaintiffs assert ... that because pension plans are vested benefits and because the CBA uses the same durational language for pension plans that it uses for the health care benefits, the health care benefits also must be vested benefits. They argue that the agreements would not use the same language ... if it had different meanings. . . . . Reviewing "each provision in question as part of the integrated whole," the use of similar language in sections [regarding pension benefits and health care benefits] provides substantial support for the plaintiffs's [sic] position. *Yard–Man,* 716 F.2d at 1479.

*Yolton,* 435 F.3d at 581 (footnotes omitted). Similarly, relying on *Yolton,* the court in *Cole v. ArvinMeritor, Inc.,* 515 F.Supp.2d 791, 803 (E.D.Mich.2006), reasoned:

Despite the substantial similarity in these duration clauses, Defendants argue that, although vested pension benefits do not end when a CBA expires, health benefits do. This Court disagrees. Virtually identical language would not be used if it was intended to have one meaning as to health benefits and another as to pension benefits.

*See Hinckley,* 866 F.Supp. at 1041 n. 4 ("Given defendant's logic, because its pension plan was incorporated into the collective bargaining agreement, its obligation to provide pensions to past retirees would

end with the expiration of the current agreement."). The court finds the reasoning in *Yolton, ArvinMeritor,* and *Hinckley* persuasive. Therefore, the court finds that the duration clause in the Insurance Plan Agreement does not terminate the health care and life insurance benefits at issue.

Therefore, for all the reasons discussed, the court finds that both the express language of the CBA as well as the SPD evidence an unambiguous intent to vest lifetime, fully-funded health care benefits for Plaintiffs.

### E. Life Insurance Benefits for Retirees

#### 1. Whether the CBA Reserved Employer's Right to Modify or Terminate Life Insurance Benefits

■ Defendant argues that two provisions of the Life Insurance Program enable the employer to modify or terminate retirees' life insurance benefits, therefore demonstrating an unambiguous intent that the life insurance coverage does not vest for life. The court disagrees.

Defendant points to Article II, Section 10(d)(3), which states, in relevant part:

**Section 10. Provisions for Employees Not Actively at Work**

. . . .

(d) Cessation of Insurance and Conversion Privilege

. . . .

(3) All insurance shall automatically cease upon the discontinuance of the Plan, or, if the provisions thereunder for any one of the forms of coverage in this Article are discontinued, that form of coverage shall be discontinued.

(Insurance Plan Agreement, Supplemental Agreements at 77–B.) The court agrees that this provision may arguably be read to reserve the employer's right to terminate life insurance coverage. The question, however, is to what coverage and to

which employees the provision applies. As Plaintiffs point out, this provision appears in a section that "primarily addresses employees on layoff or disability leave." In addition to life insurance, the provision also addresses sickness and accident insurance and disability insurance. (Pls. Opp'n Br. 10 n.9, ECF No. 160.) Life insurance benefits for retirees, on the other hand, are set forth in Article II, Section 3. Consequently, the provision upon which Defendant relies does not apply to life insurance benefits for Plaintiff retirees.

Defendant also points to Article II, Section 3(b)(1)(i), which states, in relevant part:

(b) Continuing Life Insurance After Age 65

. . . .

(i) . . . . Such remaining Life Insurance will be continued thereafter until the death of the employee, subject to the rights reserved to the Company to modify or discontinue this Plan.

(Insurance Plan Agreement, Supplemental Agreements at 44–B.) This provision appears in Section 3, entitled, "Life Insurance," which details life insurance benefits for employees both prior to, and after, age 65. Article IV, entitled "Definitions," defines "Plan" as "that portion of the Program referred to in Articles II and III, respectively." As stated previously, "Program" refers to the "amended insurance program" (in this case, the Life Insurance Program in Article II).

Defendant argues that this provision reserves the employer's right to unilaterally modify or discontinue Plaintiffs' life insurance benefits at any time. Plaintiffs argue that, at most, the employer "may have reserved the right to replace the specific life insurance plan with another, [but the employer] never reserved the right to discontinue the *benefits* provided by the plan." (Pls.' Opp'n Br. at 10 n.8.) Alterna-

tively, Plaintiffs argue that the provision creates an ambiguity, which would therefore allow the court to examine extrinsic evidence to determine the parties' intent As discussed below, the court finds that this provision is not ambiguous and that it does not constitute a reservation of Defendant's right to unilaterally terminate Plaintiffs' life insurance benefits.

The language in the instant case is far less specific than language that courts have found to constitute a reservation of rights. In *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 919 (6th Cir.2000), the Sixth Circuit held that an employer had adequately reserved its right to terminate retiree benefits where it had distributed handbooks to the retirees expressly stating that coverage could be amended or terminated. The reservation of rights language in the handbooks stated, in relevant part:

> Amendments. [The employer] reserves the right to amend or terminate any of the plans. The right to amend includes the right to curtail or eliminate coverage for any treatment, procedure, or service regardless of whether you are receiving treatment for an injury, illness, or disease contracted prior to the effective date of the amendment.
>
> . . . .
>
> Plan Changes. This insert summarizes your current retiree health care coverage. However, since no one can predict the future, Joy reserves the right to make changes or terminate these Plans.

*Id.* at 913 (emphasis omitted). The language in *Maurer* expressly mentions coverage and lists benefits in detail that could be terminated. As such, *Maurer* is distinguishable from the instant case.

The Sixth Circuit has recently reemphasized the general rule that "an existing contract cannot be unilaterally modified" and that "[t]his principle applies with equal force to collective-bargaining agreements, where employers are statutorily barred from effectuating unilateral modification[s] of . . . existing collective bargaining agreement[s]." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 443 (6th Cir.2007) (citations and internal quotation marks omitted). In *Prater*, the court noted that it had previously limited *Maurer's* holding to "unqualified reservation-of-rights language . . . that claims a unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreements. . . ." *Id.* at 444 (quoting *McCoy*, 390 F.3d at 425) (internal quotation marks omitted). The disputed language in *Prater* stated, in relevant part:

> While the employer expects retiree coverage to continue, the employer reserves the right to modify or discontinue retiree coverage at any time. . . . [The employer] may modify or amend the Plan from time to time in accordance with the provision of the collective bargaining agreement. . . . The Plan Administrator . . . may change or eliminate benefits under the plan and may terminate the entire plan or any portion of it.

*Id.* at 440 (quotation marks and citations to the record omitted). The *Prater* court reversed the district court's grant of summary judgment for the employer, holding that the employer had not reserved a right to unilaterally terminate contractual rights, in part, because the language was not as specific as that found in *Maurer*. *Id.* at 444 ("As in *McCoy*, neither summary explicitly represented to the retirees that existing medical treatment could be cut off, as the summary in *Maurer* did.").

Although the reservation of rights language in *Prater, McCoy*, and *Maurer* was all found in Summary Plan Descriptions and other extrinsic evidence, the court finds that the principles regarding reservation of rights set forth in these cases apply equally well to the language in the instant case. The purported reservation-of-rights

language in the instant case is more similar to the language found in *Prater* than that in *Maurer* because of its lack of specific reference to the coverage or benefits themselves. Furthermore, the court finds it significant that the language that may be read to specifically reserve the employer's right to discontinue benefits for employees who are on layoff or disability leave does not appear in the section that outlines the life insurance benefit in general and for retirees. The absence of language from one section that appears in another section can provide evidence as to the parties' intent *Cf. Yard–Man,* 716 F.2d at 1481–82 (finding the fact that specific duration clauses appeared in some sections evidenced an intent to not limit the duration of benefits where no such clause appeared). Therefore, the court finds that Defendant has not reserved its right to unilaterally terminate retirees' life insurance benefits.

Without the purported reservation-of-rights language, Article II, Section 3(b)(1)(i) states that "[s]uch remaining Life Insurance will be continued thereafter until the death of the employee. . . ." (Insurance Plan Agreement, Supplemental Agreements at 44–B.) In addition, Article II, Section 3(b)(3) provides that "[n]o employee contributions for Life Insurance are required after attainment of age 65." (*Id.* at 45–B.) Taken together, these two provisions demonstrate that the CBA intended to provide lifetime, fully funded life insurance benefits to retirees.

### 2. Duration Clause

As discussed previously, the duration clause in the CBA applies to both the health care benefits and the life insurance benefits. Consequently, the court's finding regarding the health care benefits, that the duration clause is merely routine and does not terminate benefits upon the termination of the CBA, is equally applicable to the life insurance benefits.

Therefore, for all the reasons discussed, the court finds that the CBA intended to vest lifetime, fully-funded life insurance benefits for Plaintiff retirees.

\* \* \*

As discussed above, the court finds that the parties intended to create fully-vested, lifetime health care and life insurance benefits for Plaintiffs. Accordingly, the court hereby grants summary judgment to Plaintiffs, as well as declaratory and injunctive relief. The court orders VCENA, under ERISA and the LMRA, to maintain fully-funded health care insurance benefits to Plaintiff retirees, spouses, surviving spouses, and eligible dependents of retirees and fully-funded life insurance benefits to Plaintiff retirees.

### F. Plaintiffs' Motion for Preliminary Injunction and Defendant's Motion to Strike

As the court has granted final relief for Plaintiffs, the Motion for Preliminary Injunction (ECF No. 182) is denied as moot. Similarly, Defendant's Motion to Strike (ECF No. 195), which seeks to strike affidavits that Plaintiffs submitted in support of their Motion for Preliminary Injunction, is also denied as moot.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment (ECF No. 155) is granted, Defendant's Motion for Summary Judgment (ECF No. 156) is denied, Plaintiffs' Motion for Preliminary Injunction (ECF No. 182) is denied as moot, and Defendant's Motion to Strike (ECF No. 195) is denied as moot. The court hereby grants declaratory and injunctive relief for Plaintiffs, ordering that VCENA is obligated under ERISA and the LMRA to maintain fully-funded health care insurance benefits to Plaintiff retirees, spouses, surviving spouses, and eligible dependents of retirees and fully-funded life insurance

benefits to Plaintiff retirees during the lifetime of the class representatives and class members.

Plaintiffs shall file any documentation regarding their request for attorney's fees and costs within 14 days of the date of this Order. Defendant shall then have 10 days to file any response.

IT IS SO ORDERED.