RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0447p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT COLE, JOHN ADAMS, and RICHARD LANTER, on behalf of themselves and a similarly situated class; and INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

*Plaintiffs-Appellees,*

*v.*

ARVINMERITOR, INC., ROCKWELL AUTOMATION, INC., and ROCKWELL INTERNATIONAL CORPORATION,

*Defendants - Appellants.*
_____

BERNARD FAUST, LOIS LAST, DAVID REAMER, and CHARLES SCHMIDT, on behalf of themselves and a similarly situated class; and INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

*Plaintiffs-Appellees,*

*v.*

ARVINMERITOR, INC., ROCKWELL AUTOMATION, INC., and ROCKWELL INTERNATIONAL CORPORATION,

*Defendants - Appellants.*

No. 06-2224

Appeal from the United States District Court

for the Eastern District of Michigan at Detroit.

Nos. 03-73872; 04-73656—Nancy G. Edmunds, District Judge.

Argued: October 28, 2008

Decided and Filed: December 16, 2008

1

Before:  MARTIN and GILMAN, Circuit Judges; DOWD, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:**  Michael A. Alaimo, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, for Appellants.  Stuart M. Israel, MARTENS, ICE, KLASS, LEGGHIO & ISRAEL, Royal Oak, Michigan, for Appellees. **ON BRIEF:** Michael A. Alaimo, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, Charles S. Mishkind, MILLER, CANFIELD, PADDOCK & STONE, Grand Rapids, Michigan, for Appellants.  Stuart M. Israel, MARTENS, ICE, KLASS, LEGGHIO & ISRAEL, Royal Oak, Michigan, Carlos F. Bermudez, Michael F. Saggau, ASSOCIATE GENERAL COUNSEL, INTERNATIONAL UNION, UAW, Detroit, Michigan, for Appellees.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  This is an action by retired employees and their union against Rockwell International Corporation and its successor companies. The plaintiffs sued the defendants under § 301 of the Labor Management Relations Act (LMRA) and the Employee Retirement Income Security Act (ERISA) to enforce what they contend was a promise by the defendants in the applicable collective bargaining agreements (CBAs) to provided retirees and their surviving spouses with lifetime healthcare benefits.  Finding that the CBAs contained such enforceable promises, the district court granted summary judgment to the plaintiffs.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

———————————

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

## I.  BACKGROUND

### A.        Factual background

Rockwell International Corporation, a diversified manufacturer that supplied parts to the automotive industry, owned industrial plants throughout the United States. In 1997, Rockwell spun off its automotive division, which became Meritor Automotive, Inc.  Meritor merged with Arvin Industries, Inc. in 2000, forming ArvinMeritor, Inc. ArvinMeritor manufactures automotive integration systems, modules, and components for manufacturers of passenger vehicles, commercial trucks, trailers, and original equipment.  Between the late 1970s and 2003, either Rockwell or ArvinMeritor closed the twelve plants at issue in this litigation, which were located in Illinois, Indiana, Kentucky, Michigan, Ohio, and Wisconsin.

All of the hourly employees at the closed plants were represented by the United Automobile, Aerospace, and Agricultural Implement Workers of America (the UAW). Rockwell/ArvinMeritor and the UAW have engaged in collective bargaining for decades, producing a succession of CBAs.  The CBAs typically covered a three-year period and followed a consistent format, including a master agreement (the National Agreement) and several supplemental agreements addressing different topics that were expressly incorporated into the National Agreement.  For example, the Supplemental Insurance Agreement (always Exhibit B) and its accompanying Insurance Program (always Exhibit B-1) addressed the health insurance coverage at issue in this case. Company-paid retiree healthcare benefits were established in 1962, with Rockwell paying half the cost.  In the 1965 CBA, Rockwell agreed to pay the full cost of retiree healthcare benefits.  The core benefits language at issue in this case first appeared in the 1968 CBA and continued in the 1971, 1974, 1977, 1980, 1982, 1985, 1988, 1991, 1994, 1997, and 2000 CBAs.  Over those years, benefits improved in various ways, but the core language regarding retiree healthcare coverage remained essentially unchanged. *See Cole v. ArvinMeritor, Inc.*, 515 F. Supp. 2d 791, 795 (E.D. Mich. 2006) (summary judgment order).

In 1991, Rockwell began to require that retirees participate in a mandatory mail-order and generic-drug program. But this change did not fundamentally alter benefits; it simply changed the mechanism for buying drugs and actually resulted in a savings to retirees. *See Cole v. ArvinMeritor, Inc.*, 516 F. Supp. 2d 850, 873 (E.D. Mich. 2005) (preliminary injunction order).

The UAW agreed to a change in benefits in 2000 that adversely affected employees who retired from the Oshkosh plant before 2001. As a result, affected employees' copayments for generic drugs went from $3 to $5, while their copayment for brand-name drugs more than doubled—from $3 to $7.

In 2001, ArvinMeritor unilaterally froze Medicare Part B premium reimbursements at 1999 levels for closed-plant retirees age 65 or older. The practical impact of this change for retirees was an increase of hundreds of dollars per year in the net amount of their Medicare premiums. Later, in 2003, ArvinMeritor unilaterally eliminated dental, vision, and hearing-aid coverages for retirees. It also increased deductibles, copays, and out-of-pocket maximums. Finally, ArvinMeritor announced plans in 2005 to eliminate all healthcare benefits as of the next year for all retirees, dependents, and surviving spouses age 65 or older.

**B.     Procedural background**

In April 2003, the UAW brought suit against ArvinMeritor and Rockwell in the United States District Court for the Eastern District of Michigan. It asserted claims under § 301 of the LMRA, 29 U.S.C. § 185, and § 501(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Later, the UAW amended its complaint to add Robert Cole, John Adams, and Richard Lanter, retirees from Rockwell plants in Ashtabula, Ohio, Detroit, Michigan, and Winchester, Kentucky respectively, as representatives for a class of similarly situated retirees (and surviving spouses) from eleven different plants. The lawsuit was based on ArvinMeritor's unilateral reduction of benefits and increase in out-of-pocket expenses for retirees in 2003.

In September 2004, the UAW, along with class representatives Bernard Faust, Lois Last, David Reamer, and Charles Schmidt, filed a substantially identical lawsuit in the Eastern District of Michigan on behalf of retirees and surviving spouses from Rockwell's plant in Oshkosh, Wisconsin. That case was consolidated with the *Cole* case in October 2005. The district court eventually certified a class of approximately 2,900 UAW-represented retirees (along with spouses and eligible dependents) from the defendants' plants in Illinois, Indiana, Kentucky, Michigan, Ohio, and Wisconsin who currently or formerly received retiree healthcare benefits from the defendants.

While the lawsuit was proceeding, ArvinMeritor made the announcement in 2005 that it was eliminating all healthcare benefits for retirees age 65 or older. This caused the plaintiffs to file a motion for a preliminary injunction to force ArvinMeritor to continue providing those benefits. After an evidentiary hearing, the district court granted the preliminary injunction. *Cole,* 516 F. Supp. 2d at 880. The court found that "the contracting parties' intention to provide lifetime retiree health coverage" was expressed in the "explicit language" of the CBAs. *Id.* at 866, 876. According to the district court, this intention was confirmed by: (1) contractual context; (2) written "lifetime" assurances to employees, retirees, and surviving spouses by multiple company officials; (3) decades of booklets and summary plan descriptions (SPDs) promising that healthcare benefits "will be continued during retirement" for both retirees and eligible dependents; (4) numerous explicit oral assurances of "lifetime" coverage made by company officials in various plants over the decades; (5) the early expression of the intent for benefits to continue "for life" in the 1971 Rockwell benefits book; and (6) the retiree insurance cards issued in 1972, 1973, and 1982; and (7) the testimony and declarations of witnesses demonstrating that the negotiated security of lifetime pension and healthcare benefits was widely known, understood, and communicated for decades among union-represented employees, supervisory employees, and company and union officials who negotiated the CBAs and the plant-closing agreements. *Id.* at 866-67.

The district court also applied a series of precedents that it referred to as the *Golden-Meridian* decisions. These are Sixth Circuit and Eastern District of Michigan

cases that the court characterized as "mirror images of the instant case," some addressing the actual UAW-Rockwell CBAs at issue, some addressing "virtually identical" CBA language, and some addressing "similar" language. All of the decisions enforced promises of lifetime retiree healthcare benefits. *See Cole*, 516 F. Supp. 2d at 865.

Following the entry of the preliminary injunction, each side moved for summary judgment, with the defendants essentially repeating the arguments they had made at the preliminary-injunction stage. The district court granted the plaintiffs' motion, denied the defendants' motion, and permanently enjoined the defendants from altering or canceling retiree healthcare benefits. *Cole*, 515 F. Supp. at 794. Quoting the language of the CBA, the court concluded:

> This language, tying pension status to retiree health benefits—and providing that the health benefits "at the time of retirement . . . shall be continued thereafter" for retirees and "any eligible dependants"—constitutes an enforceable contractual promise of lifetime retiree health benefits to accompany lifetime pension benefits . . . .

> The Court thus interprets the relevant CBAs as unambiguously promising health benefits for each retiree's lifetime and for the lifetimes of each retiree's eligible dependents and surviving spouses.

*Id.* at 800-01.

The court found that the lifetime promises were confirmed by the following:

(1) the "virtually identical" *Golden-Meridian* precedents,

(2) the contractual context, including

> (a) cost-controlling caps on retiree healthcare benefits extending "well beyond" the expiration of the CBAs, and

> (b) duration limits on healthcare benefits for those laid-off or on leave, in contrast to no duration limits on retiree healthcare benefits,

(3) the "substantial evidence of written assurances of lifetime healthcare benefits," including

(a) "lifetime" letters sent between 1988 and 2001,

(b) "for life" prescription cards issued between 1972 and 1984,

(c) the 1971 Rockwell "for life" healthcare benefits booklet, and

(d) company booklets and SPDs issued between 1968 and 2000, which assured that health benefits "will be continued during your retirement for yourself and for your eligible dependents," and

(4) "oral 'lifetime' assurances" made over four decades by company officials.

*Id.* at 798-807. In conclusion, the court noted that "[e]ven if the Court had found the contract language ambiguous, the extrinsic evidence supports the conclusion that the parties intended that retiree health benefits were vested for life." *Id.* at 809.

Upon the defendants' request, the district court later vacated the summary judgment order and issued a replacement order that was nearly identical except that it reserved a determination of the details of the permanent injunctive relief for later proceedings. The defendants then timely appealed to this court.

## II.   ANALYSIS

### A.    Vesting of healthcare-benefit plans

There are two types of employee benefit plans:  pension plans and welfare-benefit plans. *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008). Although pension plans are subject to mandatory vesting under ERISA, welfare-benefit plans are not. *Id.* Retiree healthcare-benefit plans, such as those involved here, are welfare-benefit plans; vesting only occurs if the parties so intended when they executed the applicable labor agreements. *Id.* "A court may find vested rights 'under a CBA even if the intent to vest has not been explicitly set out in the agreement.'" *Id.* (quoting *Maurer v. Joy Technologies., Inc.*, 212 F.3d 907, 915 (6th Cir. 2000)). If the rights to

healthcare coverage have vested, then the unilateral termination of coverage violates § 301 of the LMRA. *Id.* Employers are free, on the other hand, to terminate any unvested welfare benefits upon the expiration of the relevant CBA. *Id.*

This circuit's leading case for determining whether the parties to a CBA intended benefits to vest is *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Yard-Man*, 716 F.2d 1476 (6th Cir. 1983). *Yard-Man* instructs that basic rules of contract interpretation apply, meaning that the courts must first examine the CBA language to see if clear manifestations of an intent to vest are present. *Id.* at 1479. Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the so-called "*Yard-Man* inference," later decisions of this court have stated that *Yard-Man* does not create a legal presumption that retiree benefits are vested for life. *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 579 (6th Cir. 2006). *Yard-Man* is instead "properly understood as creating such an inference only if the context and other available evidence indicate an intent to vest." *Noe*, 520 F.3d at 552.

Where an ambiguity exists in the provisions of a CBA, the court may resort to extrinsic evidence to ascertain whether the parties intended for the benefits to survive the agreement. *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003). We review a district court's grant of summary judgment de novo. *Nichols v. Moore*, 477 F.3d 396, 398 (6th

Cir. 2007).  Likewise, de novo review applies to questions of contract interpretation. *Yolton*, 435 F.3d at 577.

**B.       Terms of the CBA**

We must first assess the "explicit language" of the CBAs and apply "basic principles of contract interpretation." *Yard-Man*, 716 F.2d at 1479.  Accordingly, we will address the district court's conclusion that the language of the Insurance Program specifically provides for vested lifetime retiree healthcare benefits.  In our review of the language at issue, we note that the numbering of various sections of the CBAs changed over the years, but that the substance of the text remained unchanged.  The district court, for example, refers to § 8 of the Insurance Agreement, discussed in detail below, as § 10, based on the numbering in the 1991 CBA.  We will instead reference the numbering used in the 1968 CBA, where the language at issue in this case first appeared.

### *1.       The "shall be continued" language of the Insurance Program*

The cornerstone of the district court's preliminary-injunction and summary-judgment decisions was its finding that language from Article III of the Insurance Program—a document incorporated into the CBAs—explicitly provides for lifetime retiree healthcare benefits.  Article III is titled "Health Care Benefits."  The fifth section of that article is titled "Continuance of Health Care Coverages Upon Retirement or Termination of Employment at Age 65 or Older."  Section 5(a) addresses, among other things, the "continuance" of healthcare coverage for both pension-eligible and nonpension-eligible retirees.  It provides in pertinent part:

> The Health Care . . . Coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older . . . **shall be continued thereafter** provided that suitable arrangements can be made with the Carrier(s).  Contributions for coverages so continued shall be in accordance with Article I, Section 3(b)(6).

(emphasis added).    This language, the district court concluded, "unambiguously promises lifetime health benefits."  *Cole*, 515 F. Supp. 2d at 799.

There is substantial precedential support for the district court's conclusion in the form of the *Golden-Meridian* line of cases, which it called "mirror images of the instant case." *Cole*, 516 F. Supp. 2d at 867. The *Golden-Meridian* precedents are composed of: (1) *McCoy v. Meridian Auto. Sys., Inc.*, No. 03-74613, 2004 U.S. Dist. LEXIS 29219 (E.D. Mich. Feb. 6, 2004) (O'Meara, J.) (granting a preliminary injunction for retirees based on the 1991-1994 Rockwell-UAW CBA); (2) *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417 (6th Cir. 2004) (upholding Judge O'Meara's preliminary injunction); (3) *McCoy v. Meridian Auto. Sys.*, No. 03-74613, 2005 U.S. Dist. LEXIS 40129 (E.D. Mich. Feb. 28, 2005) (O'Meara, J.) (granting summary judgment for retirees based on the 1991-1994 Rockwell-UAW CBA); (4) *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410 (E.D. Mich. 1994) (Gadola, J.) (granting a preliminary injunction for retirees based on language "virtually identical" to that in the 1991-1994 UAW-Rockwell CBA); (5) *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) (affirming Judge Gadola's decision to grant a preliminary injunction); and (6) *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173 (E.D. Mich. 1997) (Gadola J.) (granting summary judgment for retirees).

Based on the *Golden-Meridian* precedents, which addressed either the same CBAs at issue here, or "virtually identical" language from other CBAs, the district court concluded that the "shall be continued thereafter" language from the Insurance Program created an enforceable promise of lifetime benefits. But because none of the decisions in the *Golden-Meridian* line of cases addressed the effect of the durational limitation imposed by § 8 of the Insurance Agreement, we will examine below the potential limiting effect of that provision.

### 2.     *Section 8 durational limitation*

The defendants have argued at every stage of this litigation that § 8 of the Insurance Agreement expressly limits retiree insurance coverage to the duration of the CBA. Section 8 provides as follows:

> This [Insurance] Agreement and [Insurance] Program as modified and supplemented by the [Insurance] Agreement shall continue in effect until the termination of the Collective Bargaining Agreement of which this is a part.

Ins. Agreement at § 8.  The district court rejected the defendants' arguments regarding that section, characterizing § 8 as only a general durational clause.  *Cole,* 515 F. Supp. 2d at 802.  In doing so, it noted the rule in this circuit that general durational clauses cannot trump contractual promises of lifetime retiree healthcare benefits.  *Id.*  "[G]eneral durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits.  Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Yolton*, 435 F.3d at 580-81 (citations and internal quotation marks omitted).  The *Yolton* court interpreted similar "concurrent language" in the CBA at issue in that case as doing

> nothing to those employees who have already retired under the plan.  The durational language only affects *future* retirees—that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA. Thus, the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, *but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself.*

*Id.* at 581 (second emphasis added).

The district court also relied on contextual clues from other portions of the CBAs in support of its conclusion.  To start with, the court noted that the Insurance Program differentiates between active employees, inactive employees, and retirees/surviving spouses with regard to the continuation of healthcare benefits.  *Cole*, 515 F. Supp. 2d at 803.  For example, employees in "active service" are entitled to continued company-paid healthcare benefits for "any month in which the employee has earnings from the company."  *Id.*; Ins. Program, Art. I, § 3(a)(1).  Laid-off employees eligible for supplemental wage payments are entitled to continued healthcare benefits under a schedule, determined by seniority, for up to 24 months after they become inactive.  *Id.*; Ins. Program, Art. I, § 3(a)(3).  In contrast, retiree healthcare benefits are not subject to any durational limits.  They begin "at the time of retirement" and "shall be continued thereafter."  *Id.* at Art. III, § 5(a).

The district court reasoned that the differential treatment of employees by classification illustrates that Rockwell clearly knew how to set specific time limits on the continuation of healthcare benefits, and that it did so for certain classes of employees.  That it set no such limits for retirees and surviving spouses indicated to the district court that Rockwell never intended for there to be any time limitations on those benefits.  *Cole*, 515 F. Supp. 2d at 803.

The district court also stressed the fact that the Pension Plan—which the defendants admit is vested—and the Insurance Program have similar durational clauses.  It reasoned that "virtually identical" durational language would not have been used if the language was intended to have one meaning as to healthcare benefits and another as to pension benefits.  Quoting *Yolton*, 453 F.3d at 581, the district court observed that "[r]eviewing each provision in question as part of the integrated whole, the use of singular language . . . provides substantial support for the plaintiffs'[] position." *Cole*, 515 F. Supp. 2d at 803 (citation and internal punctuation marks omitted).

The defendants raise several arguments that challenge the district court's reasoning.  Their main contention is that § 8 cannot be regarded as simply a "general" durational provision because it refers to retiree benefits and expressly limits their duration to the contract term; in other words, it does not "only refer to the length of the CBAs." *See Yolton*, 435 F.3d at 580.  They note that this court in *Yard-Man* held that the phrase "'savings and pension plan programs' continue only for the duration of the collective bargaining agreement" constituted a specific durational limitation on benefits. *See Yard-Man*, 716 F.2d at 1481-82.  The defendants also cite two other cases in which the Sixth Circuit enforced very similar specific durational clauses:  *UAW v. Cleveland Gear Corp.*, No. C83-947, 1983 WL 2174 (N.D. Ohio Oct. 20, 1983), *aff'd*, No. 83-3839, 1984 U.S. App. LEXIS 13700 (6th Cir. Oct. 24, 1984), and *Bittinger v. Tecumseh Prods. Co.*, 83 F. Supp. 2d 851 (E.D. Mich. 1998), *aff'd*, 201 F.3d 440 (6th Cir. 1999).

In *Cleveland Gear*, a clause in the master contract stated:

> The Insurance Agreement and Insurance Plan, as revised, shall be effective as provided therein and shall remain in full force and effect during the term of this [CBA].

1983 WL 2174, at *2. The district court in *Cleveland Gear* concluded that the above clause clearly demonstrated an intent to limit retiree insurance coverage to the contract term, *id.*, and the Sixth Circuit affirmed based on that reasoning. 1984 U.S. App. LEXIS 13700, at *2-3.

> In *Bittinger*, the term limitation provision stated:

> The Company has established an Insurance Plan for employees covered by the Agreement and this Plan shall remain in effect for the duration of the Labor Agreement without costs to said employees.

83 F. Supp. 2d at 858. The district court in *Bittinger* found, and this court agreed, that the provision in question "unambiguously express[ed] defendants' intent that the duration of [their] obligation to provide fully funded benefits is coextensive with the CBA." *Id.* at 861.

Citing *Yolton*, the district court below distinguished *Cleveland Gear* and *Bittinger* on the ground that the agreements in those cases did not contain tie-ins to pension benefits, as do the Rockwell-UAW CBAs. *Cole*, 515 F. Supp. 2d at 803-04. This explanation is reasonable, but not irrefutable. For one thing, the *Cleveland Gear* court did not describe the contents of either the insurance agreement or the insurance plan at issue in that case. We therefore do not know whether the benefit documentation in *Cleveland Gear* had pension tie-in language or not.

More importantly, the record is less than clear that the Rockwell-UAW CBAs *do* tie retiree healthcare benefits to pension status. Both the Insurance Agreement and Insurance Program contain language expressly stating that insurance benefits are also available to retirees who are *ineligible* for pension benefits. *See* Ins. Agreement, Art. I, § 3(b)(6)(ii) (providing that insurance coverages are available to certain retirees who are ineligible for pension benefits); Ins. Program, Art. III, § 6(a) ("Hospital and Medical Expense Coverages . . . an employee has under this Article at the time of retirement *or* termination of employment at age 65 or older for any reason other than a discharge for

cause with insufficient service to entitle him to the benefit under . . . [the] Pension Plan, shall be continued thereafter.") (emphasis added).

Finally, the defendants assert that the district court's conclusion that the durational clause was general in nature ignores the fact that the National Agreement *already had* a general durational limitation (at Article XVIII), and that the parties would have had no need to negotiate a redundant general durational clause in the Insurance Agreement. An interpretation of the CBA in which one general durational clause is redundant with another would run afoul of *Yard-Man*'s adminition that CBAs must be interpreted in such a way that gives full effect to all provisions and "render[s] none nugatory." *Yard-Man*, 716 F.3d at 1480. The district court did not discuss this apparent redundancy.

Despite the plausibility of several of the defendants' arguments regarding § 8, we are bound to apply the analysis recently employed by this court in *Yolton* and *Noe*. The district court in *Noe* had concluded that two durational limitations in the benefits agreements that were incorporated into the CBAs (similar to the Insurance Agreement and Insurance Program here) expressed an intent not to vest retirement benefits. 3:06-CV-170H, 2006 U.S. Dist. LEXIS 92098, at **12-13 (W.D. Ky. Dec. 19, 2006). One of the clauses in question, § 12.1, provided that medical benefits would continue "for the duration of this Agreement." *Id.* at *12. The other provision, § 16.4, related to benefits and provided that "[u]pon termination, this Agreement shall terminate in all respects except that the benefits provided by it shall be extended for ninety (90) days following such termination." *Id.* at **12-13. Worth noting is that the durational provisions in *Noe* referred even more specifically to healthcare benefits than does § 8 in this case. *Id.*

This court reversed the district court, relying on language from *Yolton* in holding that "'absent specific durational language referring to retiree benefits themselves[,]' a general durational clause says nothing about the vesting of retiree benefits." *Noe*, 520 F.3d at 555 (quoting *Yolton*, 435 F.3d at 581). Examining § 12.1 of the Insurance Agreement in *Noe*, this court found it "indistinguishable from the language we held to

be a general durational provision" in the unpublished case of *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Loral Corp*, Nos. 95-3710, 95-3711, 1997 U.S. App. LEXIS 2118, at * 3 (6th Cir. 1997).

The *Noe* court also cited *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. BVR Liquidating, Inc.*, 190 F.3d 768 (6th Cir. 1999), in support of its conclusion. This court in *BVR Liquidating* held that retiree healthcare benefits vested notwithstanding an introductory clause stating that benefits would be provided "at no cost to the Employees or retirees for the term of this Agreement . . . ." *Id.* at 774. Likewise—and of particular relevance here—the *Noe* court found that §§ 12.1 and 16.4 were not specific limitations because they referred to "all benefits available to all employees, active and retired," but did not single out retiree benefits. *Noe*, 520 F.3d at 557.

A recent district court analyzing durational language in a CBA very similar to that in § 8 also found that the durational provision was general in nature and did not limit retirement benefits to the length of the CBA. *See Rose v. Volvo Constr. Equip. N. Am., Inc.*, 542 F. Supp. 2d 751, 763 (N.D. Ohio 2008). The court gave two reasons for its conclusion: (1) that the durational language did not specifically reference retiree healthcare benefits, and thus did not satisfy the test in *Yolton*; and (2) that the pension-plan portion of the CBA, which the defendant admitted was vested for life, was nearly identical to the provision for insurance benefits, and there was no logical basis to attribute different meanings to the two provisions. *Id.* at 764-66.

The defendants have failed to distinguish *Noe* and the other cited cases analyzing similar durational clauses, other than to contend that those cases were wrongly decided. Indeed, there is a reasonable argument to be made that, while this court has repeatedly cautioned that *Yard-Man* does not create a presumption of vesting, we have gone on to apply just such a presumption. *See Noe*, 520 F.3d at 567-68 (Sutton, J., dissenting). In any event, *Yolton* requires that a durational limitation must include a specific mention of retiree benefits in order to apply to such benefits. Section 8 of the Rockwell/UAW Insurance Agreement simply does not include such a specific mention. Moreover,

because *Noe, BVR Liquidating*, and other cases have found durational limitations even *more* specific than § 8 to constitute only general limitations, then we are bound to find that § 8 is a general limitation that does not limit retiree healthcare benefits to the length of the CBA. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel.").

**C.       The defendants' rule of construction/*North Bend Terminal* argument**

The defendants alternatively argue that, even if the durational clause in § 8 of the Insurance Agreement is not found to be determinative, there is a conflict between § 8 and the "shall be continued thereafter" language from the Insurance Program upon which the district court based its decision. They note that § 1 of the Insurance Agreement provides that, in the event of a conflict between it and the Insurance Program, the Insurance Agreement controls "to the extent necessary to eliminate such conflict." The district court did not address this argument, presumably because the argument is simply a repackaging of the defendants' position regarding § 8 in slightly different terms. Neither of the cases cited in support by the defendants arose in the same context as this case. *See UAW v. Textron, Inc.*, 359 F.2d 966 (6th Cir. 1966) (interpreting conflicting language within the CBA over the termination of pension benefits where both sides indicated an intent to terminate the agreement); *Haytcher v. ABS Indus., Inc.*, 889 F.2d 64 (6th Cir. 1985) (construing conflicting CBA language in a dispute over the funding of pension benefits). As noted in Part II.B.2. above, *Yolton* applies directly to this case and controls the outcome of the § 8 issue.

Finally, the defendants argue that there was no "meeting of the minds" on retiree healthcare benefits, and that *United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256 (6th Cir. 1985), dictates that the plaintiffs must accordingly lose. This argument seems far-fetched, at best. In *North Bend Terminal*, the CBA required the employer to contribute to a pension plan, but was silent on the issue of its liability to fully fund the plan. *Id.* at 260. This court declined to impose an obligation on the employer to continue funding the pension plan after the facility closed because the parties likely never considered the impact of a closing on the employer's funding

obligation. *Id.* We agree with the district court's evaluation of the defendants' *North Bend Terminal* argument:

> *North Bend* is easily distinguished. Here, unlike the facts in *North Bend*, the parties expressed their intent in unambiguous contract language. Even if the Court had found the contract language ambiguous, the extrinsic evidence supports the conclusion that the parties intended that retiree health benefits were vested for life.

*Cole*, 515 F. Supp. 2d at 809.

**D.    Extrinsic evidence**

Because this court's precedents under the *Golden-Meridian* line of cases, along with *Yolton*, *Noe*, and other similar decisions, hold that the language of the CBAs creates an unambiguous promise for lifetime healthcare benefits, we need not consider extrinsic evidence of the parties' intentions. But we note that such evidence, had we considered it, weighs heavily in the favor of the plaintiffs and indicates the defendants' intention to provide lifetime retiree healthcare benefits.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.