McKEAGUE, Circuit Judge,
dissenting.
Despite my colleagues’ substantial and worthy efforts, I remain unpersuaded that Detroit Diesel succeeded, through the language of the Cap Agreements, in altering its undisputed pre-existing commitment to provide fully-funded lifetime health care benefits to its retirees. Because the Cap Agreement language itself and subsequent communications between Detroit Diesel and its employees assiduously avoided informing them of any transfer of funding responsibility for health care benefits from Detroit Diesel to retirees before they retired, I would hold that their entitlement to fully-funded lifetime benefits vested upon retirement and that Detroit Diesel’s unilateral attempt to alter this entitlement in 2006 was impermissible. I therefore respectfully dissent.
In short, my disagreement with the majority stems from five considerations. First, Detroit Diesel does not dispute that until 1993, when the first Cap Agreement was entered into, it had, under the governing collective bargaining agreements, provided fully-funded lifetime health care coverage to its employees after retirement. From 1993 to 2004, plaintiffs in this action continued to work for Detroit Diesel under materially identical collective bargaining agreements, as supplemented by the Cap Agreements. That the material language in these UAW collective bargaining agreements effectively gave rise to vested entitlement to fully-funded lifetime health care benefits upon retirement is clearly established by our decisions in Cole v. Arvin-Meritor, Inc., 549 F.3d 1064, 1069-70 (6th Cir.2008), and Noe v. PolyOne Corp., 520 F.3d 548, 552 (6th Cir.2008). These are the factual and legal premises for the fundamental question presented in this case: whether the Cap Agreements altered the employees’ otherwise vested right to health care benefits upon retirement.
Second, the Cap Agreement language, succinct and carefully worded, does not, on its face, in any way limit retirees’ benefits. What is limited, or “capped,” is Detroit Diesel’s premium contribution obligation. Further, the Cap Agreement expressly provides that any required premiums in excess of Detroit Diesel’s contribution limit would be paid, not by the retirees, but by the VEBA Trust, which was jointly established and administered by Detroit Diesel and the UAW. Thus, the Cap Agreement language does not inform employees of any change in the rights otherwise conferred on them by the governing collective bargaining agreement. In other words, their pre-existing right to fully-funded lifetime health care benefits upon retirement was not affected by the plain language of the Cap Agreement.
Third, that the plain language of the Cap Agreement meant only what it purported to say was confirmed by Detroit Diesel in a writing executed contemporaneously with the first Cap Agreement in 1993. Insofar as the Cap Agreement language might be construed as impliedly transferring potential responsibility for future above-cap costs to retirees, the UAW sought clarification from Detroit Diesel prior to entering into the first Cap Agreement. The reassuring answer came in the form of a letter from Detroit Diesel Senior Vice President Paul F. Walters to UAW Regional Director Robert King, “the Walters letter,” which both sides urge us to consult in construing the Cap Agreement language. Walters made it clear that Detroit Diesel continued to fully recognize, acknowledge and confirm that retiree health care benefits had been and would continue to be lifetime benefits and that the establishment of limits on Detroit Diesel’s premium contribution obligation in no *438 way modified or negated this commitment. The Walters letter could hardly be clearer: the Cap Agreement limits on Detroit Diesel’s premium contribution obligation were not to modify retiree benefits in any way. Only after receiving this reassurance did the UAW enter into the first Cap Agreement.
Fourth, this understanding of the Cap Agreements’ non-impact on retirees’ rights was substantiated by the subsequent course of conduct between the parties. For example, in a joint presentation to employees by Detroit Diesel Chairman Roger Penske and UAW Vice President Robert King in early 1993, the premium contribution limit was portrayed, in conjunction with the VEBA Trust, as part of a cooperative effort to control health care costs while protecting and maintaining existing retiree health care benefits. Any reference to a possibility of future retiree contributions was conspicuously avoided. And indeed, for the twelve years that the Cap Agreements were in place, the parties managed to cooperate in such a way as to effectively limit Detroit Diesel’s liability for retiree health care costs while continuing to afford fully-funded benefits without requiring retiree contributions.
Fifth, inasmuch as the Cap Agreements were precipitated in part by Detroit Diesel’s desire to minimize the negative impact of new accounting requirements imposed by Financial Accounting Standard 106 (“FAS 106”), it is noteworthy that Detroit Diesel was entitled, under the terms of FAS 106, to report its retiree health care coverage liability as effectively limited by the Cap Agreements even though the contribution limits in place from 1993 through 2004 were not necessarily immutable. See FAS 106, ¶¶ 30, 35, 56, 175,180 and 182 (providing essentially that an employer is entitled to report retiree health care liability based on assumptions derived from the best information available and current plan terms, reducing its projected costs based on cost-sharing provisions (e.g., VEBA Trust contributions), without needing to anticipate any possibility of future changes, as changes are to be reported as gains or losses only when they occur). In other words, holding that the Cap Agreements, consistent with their plain language, did not alter employees’ right to fully-funded lifetime health care benefits upon retirement, would not render Detroit Diesel’s past reporting of its retiree health care liability fraudulent or deceptive or otherwise improper under FAS 106.
In sum, these considerations lead me to conclude that the Cap Agreements, though effective to serve their designed purpose while in effect, did not alter Detroit Diesel employees’ otherwise vested right to fully-funded lifetime health care benefits upon retirement. In my opinion, Detroit Diesel, by refraining from expressly transferring responsibility for future above-cap costs to the retirees (i.e., in the event the VEBA Trust and other cost control efforts failed), and by expressly disclaiming any intent to do so in the Walters letter, effectively left employees’ pre-existing rights intact and assumed the risk that the burden of above-cap costs could revert to it if the Cap Agreements were not continued. It follows that when the Cap Agreements expired and were not continued, it became incumbent on Detroit Diesel to fulfill its pre-existing and continuing collective bargaining agreement promise, even though this could require it to bear costs in excess of the previously applicable premium contribution limits. I do not maintain that the majority’s contrary analysis of the existing record under the governing law is untenable. Yet, for the reasons summarized above, I would affirm the result reached by the district court.