NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0434n.06

No. 12-1549

**FILED**

*Apr 30, 2013*

DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DANUTA C. GARBINSKI, | ) | |
| JERRIE RYNICKI, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Plaintiffs-Appellants, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: COLE and DONALD, Circuit Judges; RUSSELL, Senior District Judge.[*]

RUSSELL, Senior District Judge. Plaintiffs-Appellants Danuta Garbinski and Jerrie Rynicki (collectively "the Retirees") filed similar class actions against their former employer, Defendant-Appellee General Motors LLC ("GM" or "the Company"), after GM reduced their weekly workers' compensation benefits. The district court thereafter consolidated the two cases. The Retirees alleged that the Company's decision to coordinate workers' compensation benefits with other available benefits violated the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Michigan law, Mich. Comp. Laws §§ 418.354(11), (14). After both parties moved for summary judgment under Federal Rule of Civil Procedure 56(b), the district court denied the Retirees' motion

---

[*] The Honorable Thomas B. Russell, United States Senior District Judge for the Western District of Kentucky, sitting by designation.

and granted summary judgment in favor of GM on all three counts. The Retirees now appeal the district court's final judgment on their claims under the LMRA and Mich. Comp. Laws § 418.354(11), but do not appeal the district court's grant of summary judgment in favor of GM on claims under Mich. Comp. Laws § 418.354(14).

## I. BACKGROUND

The facts are not in dispute. Both Garbinski and Rynicki are former employees of GM who retired after becoming totally and permanently disabled as a result of work-related injuries. Garbinski was injured on March 30, 2004, and retired as a permanently disabled pensioner on April 1, 2005. Rynicki was injured on January 8, 2003, and retired as a permanently disabled pensioner on February 1, 2004. At all times during their employment, the Retirees were represented by their union, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), which undertook a series of collective bargaining agreements ("CBA" or "CBAs") with GM. Upon retiring, they began receiving payments for workers' compensation, Social Security disability insurance, and disability insurance pursuant to "the 2003 Plan," a supplemental agreement to the CBA between the UAW and GM.

When GM and the UAW adopted the 2003 Plan, the parties simultaneously executed a 2003 Letter of Agreement ("2003 Letter") that addressed the coordination of benefits under the Plan. In the 2003 Letter, GM indicated it would not coordinate workers' compensation and disability retirement benefits. Specifically, the appended paragraph states: "Pursuant to Subsection 354(14) of the Michigan Workers Compensation Act, as amended, until termination or earlier amendment

2

of the 2003 Collective Bargaining Agreement, workers compensation for employees shall not be reduced by disability retirement benefits payable under the Hourly-Rate Employees [sic] Pension Plan."

In 2007, GM and the UAW agreed to a new supplemental CBA and executed another letter agreement. Just as the 2003 Letter amended the 2003 Plan, the 2007 Letter amended the 2007 Plan to include language regarding the coordination of workers' compensation and disability retirement benefits. Further, like the 2003 Letter, the 2007 Letter contained the caveat that the amendment would last "until termination or earlier amendment of the 2007 Collective Bargaining Agreement." However, unlike the 2003 amendment, the 2007 Letter stated that disability benefits would be coordinated (reduced) for "employees who are injured and retire on or after October 1, 2007."[1] Because the Retirees had retired in 2004 and 2005, GM did not attempt to reduce their benefits after the 2007 Letter.

---

[1] The full paragraph reads:

Pursuant to Subsection 354(14) of the Michigan Workers Compensation Act, as amended, until termination or earlier amendment of the 2007 Collective Bargaining Agreement for employees who are injured and retire on or after October 1, 2007, workers compensation payments for such employees shall be reduced by disability retirement benefits payable under the Hourly-Rate Employee[] Pension Plan to the extent that the combined workers compensation payments, initial Social Security Disability Insurance Benefit amount, and the initial disability retirement benefit (per week) exceed the employee's gross Average Weekly Wage at the time of injury. In no event shall such reduction be greater than the disability retirement benefit payable.

3

Finally, in 2009, given GM's "precarious finances," GM and the UAW agreed to amend the 2007 Letter. The 2009 Letter amended the 2007 Plan to apply the provisions of the 2007 Letter (*i.e.*, reduction of benefits) "to all retirees who retired prior to January 1, 2010, regardless of their date of retirement or injury."[2] Relying on the 2009 Letter, GM subsequently reduced retired employees' workers' compensation benefits, including the Retirees' benefits. GM reduced Garbinski's weekly workers' compensation benefits from $671 to $544.78 and Rynicki's from $582.94 to $328.62.

Thereafter, both Garbinski and Rynicki filed similar class actions against GM challenging the reduction of their benefits. The Retirees claimed the decision to reduce workers' compensation benefits based on the availability of other benefits violated both the Labor Management Relations Act, 29 U.S.C. § 185(a), and Michigan law, Mich. Comp. Laws, §§ 418.534(11), (14). The two cases thereafter were consolidated. After briefing on a stipulated record, both parties moved for summary judgment on August 26, 2011. The district court denied the Retirees' motion for partial summary judgment and granted the Company's motion on both the LMRA and state law claims.

---

[2] In full, the amended language provides:

As a result of the 2009 negotiations, the parties have agreed that the 2007 letter agreement, referenced above, will be amended such that, effective January 1, 2010, the provisions of the 2007 letter agreement will be applied to all retirees who retired prior to January 1, 2010, regardless of their of their date of retirement or injury.

Additionally, the parties have agreed that, for employees who retire on or after January 1, 2010, the above referenced 2007 letter titled Workers Compensation will be eliminated and that, pursuant to the Michigan Workers Compensation Act, workers compensation payable for all such retirees shall be reduced, commencing January 1, 2010, by pension or retirement payments payable under the Hourly-Rate Employee[] Pension Plan.

## II. STANDARD OF REVIEW

The Court reviews *de novo* a district court's order of summary judgment, drawing all reasonable inferences in favor of the non-movant. *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 476 (6th Cir. 2010). Interpretation of a collective bargaining agreement is a question of law, also subject to *de novo* review. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000). Summary judgment is appropriate where no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2).

## III. DISCUSSION

The district court granted summary judgment to GM on all of the Retirees' claims. After reviewing the district court's opinion and analyzing the Retirees' claims, we find no error in the district court's opinion. Upon our own *de novo* review, we find summary judgment was warranted.

### A. LMRA Claim

As a preliminary matter, the Retirees argue that the 2009 Letter's amendment did not apply to employees who retired under the 2003 Plan. The 2003 Letter stated that GM would not coordinate workers' compensation benefits "until termination or early amendment of the 2003 Collective Bargaining Agreement." The 2009 Letter indicated that it "constitute[d] an amendment to the 2007 GM-UAW Pension Plan and shall be construed and applied as if it were therein incorporated." The Retirees argue that because the 2009 Letter only indicated it was amending the 2007 Plan, it does not modify the benefits of those who retired under the 2003 Plan.

5

There are several problems with this argument. First, the 2003 Pension Plan expressly provides that "it may be modified and supplemented by superseding provisions of this agreement." The 2007 Plan indicates it is a "supplemental agreement" and "amended plan," thus superseding the 2003 Plan. Second, this reading renders the 2009 Letter completely nugatory. The 2007 Letter indicated that all employees who retired "on or after October 1, 2007" would have their benefits coordinated. The 2009 Letter indicated that the 2007 Letter's coordination policy would "be applied to all retirees who retired prior to January 1, 2010, regardless of their date of retirement or injury." If, as the Retirees argue, the Court were to ignore that the 2009 Letter expressly contemplates coordinating benefits for "all retirees" "regardless of their date of retirement or injury" and instead read it as only applying to those who retired after 2007, the 2009 Letter would lose all meaning and merely restate the coordination policy GM adopted in the 2007 Letter. Thus, the Retirees' argument that the 2009 Letter did not attempt to amend their benefits is off the mark.

The Retirees next contend that, if the 2009 Letter did attempt to coordinate their benefits, such an amendment was improper under the CBA. Section 301(a) of the LMRA gives jurisdiction to federal courts over claims alleging the breach of a CBA. A claim arising under the LMRA is "essentially a breach of contract allegation," and as with any contract, the rights under a CBA may vest. *Schrieber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009). Whether the benefits vest depends upon the intent of the parties. *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006). A court may find a right is vested "even if the intent to vest has not been specifically set out in the agreement." *Maurer*, 212 F.3d at 915. "An employer that contractually

6

obligates itself to provide vested . . . benefits renders that promise forever unalterable." *Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (quotation omitted).

The seminal case for determining whether a CBA provides vested benefits is *UAW v. Yard-Man*, 716 F.2d 1476 (6th Cir. 1983). Under *Yard-Man*, basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. *Id.* at 1479. Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482.

With regard to the "*Yard-Man* inference," later decisions of this court have clarified that *Yard-Man* does not create a legal presumption that retiree benefits are interminable. *Yolton*, 435 F.3d at 579. Rather, *Yard-Man* is properly understood as creating an inference only if the context of the agreement and other available evidence indicate an intent to vest. *Id.* The burden of proof remains on the plaintiff to demonstrate that the parties intended for retiree benefits to vest, and it is not required for the parties to use specific anti-vesting language before a court can find that they did not intend for benefits to vest. *Maurer*, 212 F.3d at 915.

**1.**

The Retirees first dispute the district court's decision by noting that the 2003 Letter was incorporated into the 2003 Plan. They contend that in holding that their benefits did not vest, the district court looked only to the language of the letter agreements and failed to take into account provisions in the Plan that evidenced the intent to create a vested right to non-coordinated retirement benefits. For example, the Retirees point to Section 1 of the 2003 CBA, which specifies in relevant part:

> Any modification or amendment of either the Plan, or the Plan as modified and supplemented by this agreement, may be made retroactively by the Corporation with the consent of the Union, if necessary or appropriate, to qualify or maintain the Plan as a plan and trust meeting the requirements of Sections 401 and 501(a) of the Internal Revenue Code, as now in effect or hereafter amended, or any other applicable provisions of the federal tax laws, as now in effect or hereafter amended or adopted, and the regulations issued thereunder, <u>provided that pension benefits under the Plan are not diminished</u>. (emphasis added)

Under this provision, then, retroactive amendments may only be made for tax purposes and, even in those cases, must be made with the consent of the Union and cannot diminish benefits under the Plan. The Retirees argue that this provision demonstrates the intent to create a vested right in benefits provided under the Plan. They contend that, by amending the CBA to coordinate workers' compensation benefits for all retirees regardless of their retirement date, the 2009 Letter Agreement violated this provision by diminishing those benefits originally provided under the 2003 Plan and 2003 Letter.

However, by its express terms, this provision is only relevant to modifications or amendments made *retroactively*. The Retirees have argued that the 2009 Letter was a retroactive

amendment because it affected their past eligibility for benefits. However, as the district court pointed out, the 2009 Letter does not act to strip the Retirees of benefits already awarded or amend the Plan as of a prior date. Rather, the 2009 Letter dictates that "effective January 1, 2010," all retirees' benefits, including those of the Retirees, would be coordinated. The district court's finding that the 2009 Letter was a prospective amendment, and thus not barred by Section 1, is sound. Despite their arguments to the contrary, the plain language of this provision does not suggest the intent of the parties to provide the Retirees a vested right to uncoordinated benefits, but rather the intent to bar retroactive amendments that diminish accrued pension benefits under the Plan.

The Retirees also argue that Article IX, which outlines the "Amendment and Termination" provisions of the Plan, prohibits amending the Plan to coordinate their benefits. The relevant language in this section is identical in both the 2003 and 2007 versions of the Plan:

> The Corporation reserves the right to amend, modify, suspend or terminate the Plan by action of its Board of Directors, provided, however, that no such action shall alter the Plan or its operation, except as may be required by the Internal Revenue Service for the purpose of meeting the conditions for qualification and tax deduction . . . under the Internal Revenue Code, in respect of employees who are represented under a collective bargaining agreement pertaining to pension benefits and supplements as long as any such agreement is in effect. . . . Further, no such action can reduce or eliminate a Participant's accrued benefits as of the date the amendment is adopted.

The Retirees read this provision as a blanket prohibition on amendments or modifications to the Plan, with a very limited exception that allows amending the Plan only to comply with IRS/IRC requirements. Under this reading, even this limited exception allowing IRS-required amendments cannot diminish "benefits under the plan." This reading relies on picking out choice phrases and

defies common sense, reading a section that expressly governs GM's power to amend the Plan as instead forever freezing benefits and barring virtually all modifications.

First, the opening clause of the section reads not as a blanket *prohibition* on amendments, but rather as a broad reservation of the power to amend the Plan: "[t]he Corporation reserves the right to amend, modify, suspend or terminate the Plan by action of its Board of Directors." This broad reservation has an exception, though, that concededly is split confusingly in half by the IRS language: "provided, however, that no such action shall alter the Plan or its operation . . . in respect of employees who are represented under a collective bargaining agreement." This exception, however, also has a caveat: where the IRS requires amendment of the Plan, the Company may even alter the benefits of those represented by a union. Thus, read in its entirety, the Plan broadly reserves GM's power to modify or amend the terms of the Plan, except that in making any modifications, GM may not bypass the collective bargaining process unless the IRS requires the change. *See Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774, 775-76 (6th Cir. 2012) (concluding that a similarly worded agreement constituted a broad reservation of rights, despite language pertaining to the IRS).

Thus, the amendment section does not, as the Retirees contend, create an unalterable right to non-coordinated benefits, but instead (as one would expect) outlines GM's power to amend the Plan. Under a proper reading of this section, GM's actions clearly did not violate the Plan's terms. The exception to GM's power to amend—namely, an amendment that alters the benefits of current employees represented by a collective bargaining agreement—does not apply to the Retirees, who

10

are retired employees and, by their own admission, are no longer represented by the Union. The final sentence that indicates "no such action can reduce or eliminate a Participant's accrued benefits as of the date the amendment is adopted," does not help the Retirees either, GM did not propose a backward-looking reduction of Retirees' previously accrued benefits.

Finally, the Retirees cite to Article I of the 2007 Plan, which states:

Except as expressly provided in Sections 6, 7, and 8 of Article II and as provided in Article VII and Article IX, the provisions set forth in this Plan are applicable only to employees with seniority on or after October 1, 2007. Employees retired with benefits commencing prior to such date or separated prior to such date . . . shall be entitled to the benefits, if any, under the Plan as it existed immediately prior to such date.

This provision, they contend, also shows the intent to vest their right to non-coordinated benefits under the 2003 Plan. Because they were entitled to non-coordinated benefits under the 2003 Plan, they argue that by the express terms of this provision, the 2007 Plan could not strip them of that benefit. However, as the district court pointed out, the Retirees fail to take into account the reference to Article IX, which as discussed above, reserves GM's power to modify or amend the Plan.

Thus, the district court correctly held that none of the above-cited provisions lends support to the Retirees' position that their right to uncoordinated benefits under the 2003 Letter should vest. While the above provisions may have indicated an intent to protect certain accrued benefits, they themselves do not *create* vested rights.

**2.**

The Retirees' second broad attack on the district court's finding that their benefits were not vested centers on the language of the 2003 Letter, where GM provided that under the 2003 Plan, "workers compensation for employees shall not be reduced by disability retirement benefits payable under the Hourly-Rate Employee[] Pension Plan." In its memorandum opinion, the district court found that the 2003 Letter "clearly and unequivocally" limited GM's promise to provide non-coordinated benefits "until termination or earlier amendment of the 2003 Collective Bargaining Agreement," and thus "expressly repudiates an intent that the right should vest." The court added that: "[n]o reasonable reading of the 2003 letter can provide otherwise; and the same durational language was included in the 2007 and 2009 letters, as well. Accordingly, the Retirees' benefits did not vest by operation of the letters amending the CBAs because the plain language used cannot be reconciled with an intent to vest."

Rather, GM argues, the parties utilized the durational language in each letter agreement to provide "that the promise to pay double benefits" was limited to a specific time frame, "namely 'until termination or earlier amendment of the [CBA].'" GM thus followed the plain terms of the agreement when it began coordinating the Retirees' benefits *after* the 2009 Letter's amendment allowing them to do so. The Retirees argue that this clause required the non-coordination of retiree benefits and that "there is no language in the 2003 Letter Agreement or Plan that limits the duration of retiree benefits." In essence, the Retirees argue the durational language was general and thus does not preclude an intent to vest while GM argues that the durational language expressly and

specifically granted retirees the right to receive non-coordinated benefits only as long as the agreement remained in effect and unaltered.

General durational provisions "only refer to the length of the [CBAs] and not the period of time contemplated for retiree benefits." *Yolton*, 435 F.3d at 580 (alteration in original). In other words, a general durational clause "speaks generically of all benefits for all employees" and does not specifically state that retiree benefits expire when an agreement expires. *Noe v. PolyOne Corp.*, 520 F.3d 548, 554 (6th Cir. 2008). Further, "[a]bsent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Yolton*, 435 F.3d at 581.

For example, in *Yolton*, this Court concluded that a provision stating that the "group insurance plan will . . . run concurrently with this Agreement" was a general durational clause and did not preclude a finding that retiree health benefits had vested. *Id.* Further, in *Noe*, this Court held that a provision which indicated that "[t]he Pension Plan, including [certain programs administered under the Plan] . . . shall be in effect for the life of this Agreement" was a general durational clause because "[l]ike the agreement in *Yolton*, there is no language in the MOA specifically stating that retiree health benefits expire upon the termination of the agreement." *Noe*, 520 F.3d at 554. In *Yard-Man*, the Court found that certain retiree benefits had vested because the language providing the benefits lacked any durational language limiting their scope. *Yard-Man*, 716 F.2d at 1480-81. Finally, in *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008), the Court ruled that a provision expressly stating that health benefits "shall be continued" after an employee retired evinced an intent

13

that the benefits continue indefinitely that could not be trumped by a clause in another section of the CBA that said the agreement would continue until the CBA terminated. *Id.* at 1070-71.

On the other hand, where a company indicated that retirees were entitled to health coverage at no cost for their lifetimes but in the same plan document also explicitly reserved the right to change or terminate the plan, this Court found "'the promise made to retirees was a qualified one: the promise was that . . . benefits were for life provided the company chose not to terminate the plans, pursuant to clauses that preserved the company's right to terminate the plan under which those benefits are provided.'" *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998) (en banc) (quoting *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 904 n.12 (3d Cir. 1995)) (finding "no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change").

The clause here is distinguishable from those classified as general durational clauses in other cases. In each of those cases, the clauses at issue referred only to the CBA or the benefit plan as a whole in stating the benefit plan *in general* would terminate when the CBA terminated. By contrast, the 2003 Letter, which creates the right to uncoordinated workers' compensation benefits, clearly prefaces that newly-created right with a time limit: only "until termination or earlier amendment of the 2003 [CBA]." This much more closely resembles the provision in *Sprague*, where the company informed retirees of the right but in the same document informed them that the right was subject to

14

modification.  Further, this case is stronger than the facts of *Sprague*, as the clause placing limits on the right was in the *very same sentence* as the right it created, not just the same document.

## B.  State Law Claim

Michigan's workers' compensation regime provides an employee who suffers an injury "arising out of and in the course of employment" with the "exclusive remedy" of certain specified compensation.  Mich. Comp. Laws § 418.101, *et seq.*  This compensation is payable "not for the injury" but for the disability, or the employee's "loss of wage-earning capacity."  *Franks v. White Pine Copper Div.*, 375 N.W.2d 715, 722 (Mich. 1985), superseded by statute as stated in *Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992).

Because workers' compensation and disability retirement benefits are both employer-funded benefits with the shared goal of compensating a disabled employee's lost earning potential, the Michigan legislature enacted a statute allowing employers to "coordinate" a former employee's workers' compensation payments with a list of other particular benefits to the same disabled employee.  *See* Mich. Comp. Laws § 418.354(1).  However, employers are not *required* to coordinate benefits, and a disability pension plan may provide that benefits will not be coordinated as allowed under section 418.354.  *Id.* § 418.354(14).  Specifically, under Michigan law, an employer's obligation to pay workers' compensation "shall be reduced," or set off, by a "disability insurance policy provided by the same employer."  *Id.* § 418.354(1)(b).  For example, an employer may reduce workers' compensation to an employee by "[f]ifty percent of the amount of the old-age insurance benefits received or being received under the social security act."  *Id.* § 418.354(1)(a).

Further, under section 418.354(11), an employer may "consider" a retiree's Social Security *Disability Insurance* (SSDI) benefits "as old-age benefit payments are considered," but only if the Social Security Act (SSA) is amended in a certain way.[3] The parties do not dispute that the SSA has not been so amended.

The 2009 Letter amended the Plan governing the Retirees' benefits to allow for the limited coordination of workers' compensation payments with the disability benefits a retiree is receiving under GM's pension plan. Specifically, the amount GM would pay in workers' compensation would be "reduced by disability retirement benefits payable under the Hourly-Rate Employee[] Pension Plan to the extent that the combined workers compensation payments, initial Social Security Disability Insurance Benefit amount, and the initial disability retirement benefit (per week) exceed the employee's gross Average Weekly Wage at the time of injury. In no event shall such reduction be greater than the disability retirement benefit payable." In other words, GM looks to a retiree's SSDI benefits to ensure that coordination would not leave the retiree worse off after his injury than before. Thus, the 2009 Letter sets a cap on the amount that a retiree's workers' compensation may be reduced.

Because this cap is calculated by looking at a retiree's total income before coordination and after, and the total income includes SSDI benefits, the Retirees argue GM is improperly

---

[3] Currently, where an individual also receives workers' compensation, the amount of Social Security Disability Insurance benefits she may receive are reduced. *See* 20 C.F.R. § 404.408. Thus, under Michigan law, unless the Social Security Act is amended to discontinue this offset, an employer may not reduce the amount it pays in workers' compensation by SSDI benefits. This avoids a double reduction that would otherwise occur. *See* Mich. Comp. Laws § 418.354(11).

"considering" SSDI under Michigan law and "using social security benefits as a benchmark to set the Retirees' post-2009 worker's compensation benefits." However, Mich. Comp. Laws § 418.354(11) prohibits an employer from "considering" SSDI to be a "primary payment on the employer's obligation" to pay workers' compensation. Thus, Michigan law prohibits an employer from coordinating SSDI benefits with workers' compensation payments. GM is not using SSDI benefits to partially satisfy its obligation to pay workers' compensation benefits; thus it is not "considering" SSDI benefits in a way prohibited under Michigan law. Rather, SSDI is part of an equation designed to *reduce* the amount GM would otherwise lawfully coordinate workers' compensation benefits with disability benefits provided under the GM Pension Plan. That is not what the plain language of section 418.354(11) prohibits.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.